B. D. BOWMER AND OTHERS v. MARY HICKS AND OTHERS.

The court charged the jury, "If, at the date of the issuance of a title," (in 1835, by the commissioner of Robertson's colony, to a party, as a colonist in said colony, who claimed to be the head of a family,) "he was not domi-"ciliated in Texas, but was a citizen of, and domiciliated in the United States "of America, then the title issued to him by the commissioner, was from the "beginning an absolute nullity, conferring no rights on the grantee, nor those "who claim under him;" and it being evident, that the verdict was controlled by this charge : Held, that the charge was erroneous, and the judgment should be reversed.

This precise question was decided in the case of Johnson v. Smith, 21 Tex. Rep., where it was held, that evidence could not be admitted to prove that the grantee had not brought his family to the country, and had not, in fact, become domiciled here, for the purpose of showing that he was not entitled to the grant, or had committed a fraud in obtaining it; that the original validity of a grant, regularly issued by competent authority, could not be thus impeached.

In the early cases of Holliman v. Peebles, 1 Tex. Rep. 673, and Horton v. Brown, 2 Id. 78; and subsequently, in Yates v. Iams, 10 Id. 168, it was decided, that under the colonization laws, and particularly the 15th article of the National law of the 18th of August, 1824, and the 30th article of the law of the State, of the 24th of March, 1825, the effect of leaving the country, and becoming domiciled in a foreign government, after having obtained a grant, was, to defeat the estate of the grantee, and restore the land to the mass of vacant

public domain; and that it might be re-granted, without judicial inquiry to ascertain the fact of abandonment.

But this consequence does not attach to any other act of the grantee, by which he forfeits the title to his land, or to the non-performance of conditions subsequent, annexed to the grant. In these cases, it has been held, that the forfeiture must be ascertained by judicial inquiry, in some mode to be provided by law, in order to divest the title, before the State can resume the grant, or otherwise appropriate the land.

APPEAL from Williamson. Tried below before the Hon. Nat. M. Burford. Suit by appellees, Mary Hicks and others, as heirs of Milton Hicks, deceased, for one league of land, located and surveyed on the 15th of April, 1849, by virtue of the head-right certificate of the said Milton Hicks, deceased; and also to remove a cloud from their title, occasioned by the wrongful claim which the appellants set up to the said land, under a title issued by William H. Steele, commissioner, to Elisha D. Harmon, as a colonist in Robertson's colony, on the 7th of November, 1835, and which appellees charged was null and void from the beginning.

The appellants claimed under said grant to Harmon. The jury found for the appellees, "the right to recover the land;" and also, "that the grant to Elisha D. Harmon, was from the beginning void."

*Fisk* and *Bowers*, for appellants.

*I. A. & Geo. W. Paschal,* and *Phil. Claiborne,* for appellees.—We understand these two propositions to be distinct, and to rest upon independent provisions of law.

1. If a party obtained a title to lands, under the colonization laws, being at the time domiciliated in a foreign country, the title was simply a nullity from the beginning, as being against the whole policy of the colonization laws; and that nullity was thus declared in the 16th Article of the National Colonization Decree: "No person, who by virtue of this law, acquires a title to lands, shall hold them if he is domiciliated out of the limits of the Republic."

The same principle is clearly maintained in Holliman v. Peebles, 1 Tex. Rep. 673; Horton v. Brown, 2 Id. 78; Hardy v. De Leon, 5 Id. 211.

2. The second proposition rests upon what the common law writers denominate a limitation in law. (2 Black. Com. 155.) That is, the grants to colonists were made with the limitation, in the law itself, that if the colonist, legally entitled at the time, received a grant, and afterwards went to reside in a foreign country, without having first disposed of his land, (which he could not do under six years, until after the decree of 1834,) the land simply reverted to the Government; or, in other words, became entirely vacant, without the necessity of any finding, in order to forfeit the land, or to re-incorporate it into the public domain. (Laws of C. and Texas, Decree No. 190, Art. 33 ; Decree No. 16, Art. 30 ; Holliman v. Peebles, 1 Tex. Rep. 673; Brown v. Horton, 2 Id. 78; Yates v. Iams, 10 Id. 168, already cited. See, also, the clear case of McKinney v. Saviego, 18 How. Rep. 235.)

Now, this whole class of cases comes precisely within the principle of a limitation in law, as contradistinguished from a condition in a deed, thus defined by Blackstone :

"A distinction is however made between a *condition in deed,* and a *limitation,* which Littleton denominates also a *condition in law.* For when an estate is so expressly confined, and limited, by the words of its creation, that it cannot endure for any longer time than till the contingency happens upon which the estate is to fail, this is denominated a *limitation:* as when land is granted to a man, *so long as* he is parson of Dale, or *while* he continues unmarried, or *until* out of the rents and profits he shall have made £500, and the like. In such case, the estate determines as soon as the contingency happens, (when he ceases to be parson, marries a wife, or has received the £500,) and the next subsequent estate, which depends upon such determination, becomes immediately vested, without any act to be done by him who is next in expectancy. But when an estate is, strictly speaking, upon *condition in deed,* (as if granted expressly *upon condition* to be

void upon the payment of £40 by the grantor, or *so that* the grantee continues unmarried, or *provided* he goes to York, &c.,) the law permits it to endure beyond the time when such contingency happens, unless the grantor, or his heir, or assigns, take advantage of a breach of the condition, and make either an entry or a claim in order to avoid the estate. Yet, though strict words of condition be used in the creation of the estate, if, on breach of the condition, the estate be limited over to a third person, and does not immediately revert to the grantor or his representatives, (as if an estate be granted by A. to B., on condition that within two years B. intermarry with C., and on failure thereof, then to D. and his heirs,) this the law construes to be a limitation, and not a condition : because, if it were a condition, then, upon the breach thereof, only A. or his representatives could avoid the estate by entry, and so D.'s remainder might be defeated by their neglecting to enter ; but, when it is a limitation, the estate of B. determines, and that of D. commences, and he may enter on the lands, the instant that the failure happens. So also, if a man, by his will, devises land to his heir at law, on condition that he pays a sum of money, and for non-payment devises it over, this shall be considered as a limitation ; otherwise, no advantage could be taken of the non-payment, for none but the heir himself could have entered for a breach of condition."

The failure to take this simple distinction, has caused the counsel of the defendant to confound the principle with Hancock v. McKinney, 7 Tex. Rep. 384 ; Chambers v. Jenkins, 9 Id. 177 ; Swift v. Herrera, 9 Id. 263, and the other cases of that class. And he even invokes Paul v. Perez, 7 Tex. Rep. 338, and Swift v. Herrera, 9 Id. 263, to prove that, since the adoption of the State constitution, we cannot be heard to prove a forfeiture.

This may be true, where the forfeiture depends upon the performance of conditions subsequent ; or the abandonment of the country, to avoid a participation in the revolution. These cases carry the provision of the State constitution far enough. By

no logic can it be made to extend to the cases, where the very law upon which the title rested declared the forfeiture. These very cases take the distinction.

In this class of cases, this court simply held the conditions of non-payment, and cultivation, to be conditions subsequent, the failure to perform which did not, *ipso facto*, forfeit the grant, but left the matter between the grantee and the government, to be regulated by subsequent legislation. The distinction, at common law, was a marked one. Payment, was a condition subsequent; continued residence, was a limitation in law—just as much so, as a grant to a woman during widowhood, or to a man during his residence in Austin. In either event, as if the widow marries, or the man removes, *eo instanti*, the estate determines, and either reverts, or else passes to the heir, or next grantee, according to the terms of the grant.

Upon this point, in some shape or other, depends this whole case. (Act of 5th Feb. 1853; Thatcher v. Mills, 14 Tex. Rep. 13; Converse v. McKee, Id. 20; Seawell v. Lowery, 16 Id. 47.)

WHEELER, CH. J. It is evident, from the record, that the question on which the decision of this case was made to turn at the trial, was, whether the defendant, Fisk's vendor, Harmon, was domiciled in the country, at the time he obtained the grant. It was assumed that, if he had not his domicil in the country, at the time, the grant was void. Thus the court instructed the jury that, "If, at the date of the "issuance of the title to Harmon, he was not domiciliated "in Texas, but was a citizen of, and domiciliated in the "State of Illinois, in the United States of America, then the "title issued to him by the commissioner, Steele, was, from "the beginning, an absolute nullity, conferring no rights on the "grantee, nor on those who claim under him." The greater portion of the charge of the court, was upon the law of domicil, explaining to the jury in what it consists, and what is essential to effect a change of domicil. The jury were instructed, in substance, that unless the intention of the grantee, at the time

of obtaining the grant, was to make this country his future home, he could not be deemed to have his domicil here, and the grant was void. And the jury, in their verdict, responded to the charge of the court respecting the validity of the title, in such terms as leave no doubt that this was the ground on which the case was decided. They say, "We also find that "the grant in evidence to Elisha D. Harmon, was, from the "beginning, void."

The evidence is uncontradicted, that Harmon came to the country, in the spring of 1835, and that he was residing in Bastrop, when he obtained the grant, (Nov. 7th, 1835.) He continued to reside there, until the settlement was broken up, and the inhabitants left it, at the beginning of the campaign, in the spring of 1836. Harmon left with the other inhabitants, having, as appears, obtained a permit (in February, 1836) from the judge, in the first instance, to go to the United States, "on business, and return at his pleasure." He, however, as it seems, did not leave the country immediately; for he appears to have obtained another similar permit, in November of that year. He appears then to have left. But it is further in proof, that he was again residing in Bastrop, in 1838; he had hands employed in building a house there at that time.

Shortly before obtaining his grant, he told the witness, Hornsby, that he intended bringing his family to the country, and that he could satisfy him that he would bring them, by letters then in his possession. There is no evidence of a contrary intention entertained by him at that time; and if the decision of the case depended, as there is little doubt it was made to depend, at the trial, upon that question, it would be difficult to point to the evidence in the record, which disproves the truth of his declaration of intention, made at the time, or which would warrant the jury in finding, that such was not his intention. There is the fact, that he did not bring his family to the country; but it would not be less reasonable to conclude, that he was prevented, by the dangers to which they would have been exposed upon that frontier, for a series of years after the

settlement was broken up in the spring of 1836, than that he did not entertain the intention, at the time he obtained the grant. But the decision of the case did not depend upon that question; nor was that an inquiry which could be properly entertained for the purpose of invalidating the grant. That the grantee possessed all the requisite legal qualifications to entitle him to the grant, and that the grant itself concludes all after inquiry upon that subject, has been repeatedly decided. This precise question was decided in the case of Johnson v. Smith, 21 Tex. Rep. 722, where it was held, that evidence cannot be admitted to prove that the grantee had not brought his family to the country, and had not, in fact, become domiciled here, for the purpose of showing that he was not entitled to the grant, or had committed a fraud in obtaining it; that the original validity of a grant, regularly issued by competent authority, cannot be thus impeached. (Ib. and cases cited.)

Whether, after having obtained the grant, the grantee abandoned the country, before alienating the land, and established his domicil in a foreign government, whereby his estate was defeated, and the land became vacant and subject to location, is a different question. In the early cases of Holliman v. Peebles, 1 Tex. Rep. 673, and Horton v. Brown, 2 Id. 78, it was decided that, under the colonization laws, and particularly the 15th Art. of the National law of the 18th of August, 1824, and the 30th Art. of the law of the State of the 24th of March, 1825, the effect of leaving the country, and becoming domiciled in a foreign government, after having obtained a grant, was, to defeat the estate of the grantee, and restore the land to the mass of vacant public domain; and that it might be again granted, without judicial inquiry to ascertain the fact of abandonment of the country by the first grantee. The same doctrine has been held in a subsequent case. (Yates v. Iams, 10 Tex. Rep. 168.) But this consequence has been held not to attach to any other act of the grantee, by which he forfeited the title to his land; or to the non-performance of conditions subsequent, annexed to the grant. (Swift v. Herrera, 9 Tex. Rep. 263; Han-

cock v. McKinney, 7 Id. 384; Rivers v. Foote, 11 Id. 672.) In these cases, it was held, that the forfeiture must be ascertained by judicial inquiry, in some mode to be provided by law, in order to divest the title of the grantee, before the State could resume the grant, or otherwise appropriate the land. (Ib.)

Because the court erred in its rulings, to the effect that the estate of the grantee of the title under which the defendant's claim, could be defeated, and the title annulled, by proof that he did not possess the requisite qualifications, or had not performed the necessary conditions to entitle him to the grant, at the time it was issued, the judgment must be reversed, and the cause remanded.

Reversed and remanded.